**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LECAT'S VENTRILOSCOPE, | ) | |
| An Ohio Limited Liability Company, | ) | |
| | ) | Civil Action No.: 1:16-cv-05298 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Hon. Judge: Ruben Castillo |
| MT TOOL AND MANUFACTURING, | ) | |
| An Illinois Corporation, | ) | |
| | ) | Magistrate Judge: Hon. Jeffrey T. Gilbert |
| Defendant. | ) | |
| ——————————————— | ) | |

**DEFENDANT'S MOTION TO STRIKE**
**PLAINTIFF'S INITIAL INFRINGEMENT CONTENTIONS**

Defendant MT Tool and Manufacturing hereby moves the Court to strike the initial Infringement Contentions ("Contentions"; <u>Exhibit</u> A) served by Plaintiff Lecat's Ventriloscope because the Contentions (1) fail to specifically identify where the "auscultation device" claim element finds response in the accused instrumentality, (2) fail to specifically identify any direct infringement; and (3) fail to specifically identify acts by Defendant that induce infringement of the asserted claims.

**FACTUAL BACKGROUND**

In February of 2015, responding to accusations of infringement, counsel for Defendant notified Plaintiff by letter (Dkt. #1, Ex. D) that lack of the claimed "auscultation device" in the accused product precluded infringement of U.S. Patent 7,645,141 ("141 Patent"). In pre-filing communications, Defendant also asserted that Plaintiff had not conducted any actual inspection of the accused product. (Dkt. #1, Ex. D). Plaintiff never responded to either of these assertions, instead filing its single count Complaint for induced infringement over one year later.

Currently pending is a Motion to Dismiss Plaintiff's Complaint for failure to state a cause

of action; wherein Defendant asserts that the absence of any plausible pleadings as to where the claimed "auscultation device" is present in the accused product renders Plaintiff's infringement claim deficient. (Dkt. #23). On November 30, 2016, Plaintiff served its initial infringement contentions required by Local Patent Rule ("LPR") 2.2. Plaintiff's initial contentions include claim charts that are, at least with regard to the term "auscultation device" identical to those included in its Complaint. Defendant contacted Plaintiff on December 2, 2016 requesting supplemental contentions and resetting of the deadline for Defendant's invalidity and non-infringement contentions because Plaintiff's initial contentions, among other things, failed to specifically identify the claimed "auscultation device" in the accused product.[1] Defendant also asserted that Plaintiff had not yet conducted any actual inspection of the accused product. Plaintiff refused to supplement its infringement contentions. Moreover, Plaintiff did not deny that an inspection of the actual accused product had yet to be conducted. The parties have exchange initial disclosures and Plaintiff is in possession of information that further describes the accused product and method of use.

The '141 patent relates to "an arrangement and method for auscultation training … including a transmitter associated with an audio device for transmitting an audio signal to an auscultation device." *See* '141 patent, Abstract (Dkt. #1-1). As expressly defined in the '141 patent, *"[a]uscultation is the act of listening to sounds <u>within the body</u> as a method of diagnosis"* (first sentence of Backround, Dkt. #1-1, emphasis added). Quite tellingly, Plaintiff's own Complaint also defines auscultation as "the act of listening to sounds arising within organs (as the lungs or heart) as an aid to diagnosis and treatment." (Dkt. #1, ¶15, emphasis added). The embodiments described in the '141 patent show that the alleged invention described therein

---

[1] Counsel for the parties had further discussions this week in a good faith effort to resolve this Motion, but no agreement was reached.

involved the mere placement of a small speaker and wireless receiver in a prior art standard stethoscope, such that the speaker plays sounds into the diaphragm of the standard stethoscope, Description (Dkt. #1-1).

The '141 patent issued with sixteen claims, which define its scope of protection Moreover, each and every embodiment described in the '141 patent involves the use of an "auscultation device" in the form of a standard, functioning stethoscope with implements for listening to sounds in the human body. *See* '141 patent, col. 3. Lines 36-54, col. 4, lines 1-25 and Figs. 3 (Dkt. #1-1). The '141 patent describes how this arrangement, where the sound generated by the speaker travels through the stethoscope in the same manner as sound generated by the diaphragm, provides a "realistic simulation of an ausculatory finding." *Id*. at col. 4, lines 22-25. The term "auscultation device" appears in each and every claim of the '141 patent.

Moreover, Claims 1-11 each explicitly include, inter alia, the following limitation(s) from independent Claim 1: "*a signal generator capable of generating an audio signal representing at least one sound, the signal generator being controlled by a human operator, wherein the human operator plays one or more appropriate audio files according to a user's placement of a stethoscope headpiece on a patient*;" *See* '141 patent, Col. 5, lines 55-60 (Dkt. #1-1). Claims 12-16 each explicitly include, inter alia, the following limitation(s) from independent Claim 12: "*an operator observing the placement of an auscultation device by a user relative to a patient*;" *See* '141 patent, Col. 6, lines 41-42 (Dkt# 1-1).

## ARGUMENT

### I. The Court Should Strike Plaintiff's Infringement Contentions Because They Fail To Specifically Identify The "Auscultation Device" Required By All Asserted Claims

This Court's Local Patent Rules "require…meaningful disclosure of each party's contentions and support for allegations in the pleadings." LPR, Preamble (emphasis added).

The purpose of the local patent rules is to "prevent a 'shifting sands' approach to claim construction by forcing the parties to crystallize their theories of the case early in litigation." *Sloan Valve Co., v. Zurn Indus., Inc.,* No. 1:10-cv-00204, Paper #713, 2012 WL 6214608, at *2 (N.D. Ill. Dec. 13, 2012) *citing Fujitsu Ltd. v. Tellabs Ops., Inc.*, Nos. 08 C 3379, 09 C 4530, 2012 WL 5444979 at *4. Specifically, "[t]he purpose of infringement contentions is to provide notice of the plaintiff's theories of infringement early in the case because, in practice, it is difficult to obtain such information through traditional discovery means, such as interrogatories." *Id.* Indeed, the purpose of the initial disclosures pursuant to LPR 2.2 – 2.5 is to identify the likely issues in the case, to enable the parties to focus and narrow their discovery requests. *See Comment to LPR 1.6.* To accomplish this purpose, the parties' disclosures must be meaningful—as opposed to boilerplate—and non-evasive. *See Comment to LPR 2.2.*

Furthermore, one of the primary goals of infringement contentions is "to allow the defendant to pin down the plaintiff's theories of liability and to allow the plaintiff to pin down the defendant's theories of defense, thus confining discovery and trial preparation to information that is pertinent to the theories of the case." *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1365 (Fed. Cir. 2006); *see also Morningware, Inc. v. Hearthware Home Prods., Inc.*, No. 09-C-4348, 2010 WL 3781254, at *2 (N.D. Ill. Sept. 22, 2010) (stating that the purpose of the LPR's initial disclosures "is to identify the issues in the case and allow the parties to narrow their discovery requests.").

Infringement contentions must set forth particular theories of infringement with sufficient specificity to provide defendants with notice of infringement beyond that which is provided by the mere language of the patents themselves. *Trading Techs. Int'l, Inc. v. CQG, Inc.,* No. 05-CV-4811, 2014 WL 4477932, at *2 (N.D. Ill. Sept. 10, 2014) (citing *Fujitsu Ltd. v. Tellabs*

4

*Operations, Inc.,* No. 08 C 3379, 2012 WL 3018027, at *4 (N.D. Ill. July 23, 2012)). Infringement theories have been struck, or courts have given leave to amend, where a party has provided no specificity for the basis of the infringement theory. *Morningware, Inc. v. Hearthware Home Products, Inc.,* No. 09C4348, 2010 WL 3781254, at *7 (N.D. Ill. Sept. 22, 2010) (striking doctrine of equivalents infringement theory not sufficiently disclosed).

Local Patent Rule 2.2(c) requires "a chart identifying <u>specifically where each element</u> of each asserted claim is found within each Accused Instrumentality…" (emphasis added). In the Contentions, Plaintiff incorporated substantially the same deficient claim charts included in their pleadings, which are currently the subject of a pending motion to dismiss. More particularly, with regard to the "auscultation device" element, the Contentions contain no identification whatsoever as to where the "auscultation device" can be found in the accused activity. Plaintiff's claim charts in its Contentions do not specifically address the "auscultation device" element at all. Rather, the charts rely on website descriptions of a "simulation stethoscope" which Plaintiff has long ago been informed is not capable of auscultation. Throughout Plaintiff's charts, the "auscultation device" element is ignored or conclusorily stated to be present by virtue of the described "simulation stethoscope" known by Plaintiff to be incapable of performing auscultation. For example, with regard to claim 1, the Contentions' claim charts state only:

| an auscultation device, comprising a stethoscope, | The MT Tools web page describes the S-Scope as follows: "Once a student places the stethoscope on the appropriate listening post the instructor / SP activates the sound file. The student hears the sounds through the stethoscope." The S-Scope spec sheet is entitled "MT S-Scope Simulation Stethoscope" and states that the "MT S-Scope gives students a more realistic auscultation experience." The S-Scope Getting Started booklet refers to the "MT S-Scope Stethoscope." Accordingly, the S-Scope includes a stethoscope. |
|---|---|

(Exhibit A, page 6).  Moreover, claim 12 recites an "auscultation device" five times (Exhibit A, pp. 9-12) and does not recite a stethoscope, and for each recital Plaintiff merely cites website descriptions of the "simulation stethoscope" without specifically identifying how the accused device could be considered an "auscultation device."

Plaintiff's contentions thus offer no specific identification as to where "auscultation" is found in the accused device or accused activity. Nor do the Contentions put forth Plaintiff's theories as to how a device that is incapable of auscultation meets the limitations of an "auscultation device" in the claims.  Plaintiff's Contentions merely continue the ambiguity and evasiveness it began pre-filing and through the pleading stage in refusing to specify where the claimed "auscultation device" can be found.  However, Plaintiff is required to set forth its theories of infringement, and Defendant needs to know specifically how Plaintiff is contending that the claimed "auscultation device" is found in the accused activity.  More particularly, Defendant needs to know how the Plaintiff theorizes that the claimed "auscultation" is present in the accused product or activity.  The descriptions offered by Plaintiff of a "simulation stethoscope" is not sufficient because such do not reveal any theory of Plaintiff as to what makes the simulation stethoscope an auscultation device.  As such, the Court should strike Plaintiff's Infringement Contentions and compel Plaintiff to specifically identify where the "auscultation device" is found in the accused instrumentality.

Notably, in its Contentions under LPR 2.2(d), Plaintiff, states that "Lecat asserts that every element in each of the asserted claims is literally present in the Accused Instrumentality". Yet, the Contentions provide no identification as to how the "auscultation device" in the claims is met literally.

6

II.     **The Court Should Strike Plaintiff's Infringement Contentions Because They Fail To Sufficiently Specify Acts Of Defendant That Are Inducing Direct Infringement**

Owing in part to Plaintiff's failure to identify specifically where the "auscultation device" is found in the accused product, as discussed above, Plaintiff's contentions fail to sufficiently identify the acts of defendant that induce direct infringement as required by LPR 2.2(e).  Plaintiff is fully aware that the simulation stethoscope referenced in its contention charts is not capable of performing auscultation, as it was advised of this fact pre-filing. (Dkt. #1, Ex. D).   For this reason alone, the charts do not sufficiently identify what acts Defendant, in providing a simulation device, induce the alleged infringement.

In addition to the above deficiencies, Plaintiff's contentions fail to address the indefinite nature of the claims in this case, which require not only a particular apparatus/product, but specific interaction with the apparatus/product by three differently-claimed actors performing steps or actions.  As set forth in Defendant's pending Motion to Dismiss, the asserted claims, require three differently-termed actors – a "human operator", "a patient" and a "user" to interact with the apparatus in a particular way defined in the claims.  (Dkt.  #23, pages 9-11).  Even assuming for the sake of argument that this combination of product characteristics, actors and steps peformed by them somewhere or somehow directly infringes, Plaintiff's contentions fail to specify the acts by defendant that result in downstream arrangement of these elements in the allegedly infringing combination.  Moreover, the peculiar wording of the asserted claims in this case creates a confusing situation where given activity may be infringing or not, depending on how actors interact with the accused product downstream of the product's manufacture/sale. Given these characteristics of the claims, to comply with Rule 2.2(e), Plaintiff needs to identify specific acts of Defendant that induce downstream actors to interact in the particular claimed way and assume the particular roles of "human operator" "user" and "patient" as specified in the

claims. Plaintiff's contentions simply fail to do this.

The website descriptions relied on by Plaintiff in its claim charts stating that "Standardized patients simply tap the appropriate listening post icon to play the corresponding sound through the students MT S-Scope," make it clear that only two persons are described as interacting with the accused product. Exhibit A, p. 10. Thus, for such a given downstream "arrangement" of actors interacting with the device, Plaintiff's contentions fail to identify how instructions involving two actors induce end users to interact with a "human operator," a "user" and a "patient" in the manner set forth in the claims. Further, Plaintiff's contentions do not point to specific acts by Defendant that induce any actors to interact in the manner set forth in the claims. To the contrary, the Contentions' apparent implicit assigning of different roles to the same actors, makes clear the possibility that students, instructors and/or patients can interact in a number of different ways with the accused product, some of which would be outside the scope of the asserted claims.

Plaintiff does not specifically identify how the website descriptions constitute acts by Defendant to specifically induce end users to interact with the device and other actors in the manner set forth in the claims. As a specific example, claim 1 requires the step of "wherein the human operator plays one or more appropriate audio files according to a user's placement of a stethoscope headpiece on a patient. (Exhibit A, p. 5) In the corresponding right hand column of the chart, Plaintiff refers to web page descriptions implying that the device may be used in a scenario where the standardized patient operates the device to play sounds to the student. Yet Plaintiff does not identify which of these people constitutes the claimed "human operator" or which constitutes the claimed "user" or which constitutes the claimed "patient." Moreover, Plaintiff does not at all identify what acts by Defendant induce the described standardized

patients and students to interact with the device in the manner claimed.

LPR 2.2(e) requires:

"for each claim that is alleged to have been indirectly infringed, an identification of any direct infringement and a description of the acts of the alleged indirect infringer that contribute to or are inducing that direct infringement. If the alleged direct infringement is based on joint acts of multiple parties, the role of each such party in the direct infringement must be described"

Judge Blakey of this Court recently granted a motion to strike infringement contentions because the patent holder did not describe the "way" in which the defendant induced infringement. *Fatigue Fracture Technology, LLC v. Navistar, Inc.*, Case No. 1:15-cv-05667, Docket entry #66 (October 17, 2016) (Exhibit B). Similarly, Defendant submits that Plaintiff's Infringement Contentions fall short of describing the way in which Defendant induces infringement of the asserted claims, and thus fail to comply with LPR 2.2(e).

## CONCLUSION

For the reasons set forth above, Defendant respectfully requests that this Court grant this Motion, issue an Order striking Plaintiff's Infringement Contentions, and reset the due date for Defendant's Invalidity and Non-infringement Contentions until after Plaintiff provides proper infringement contentions that comply with the LPRs.

Respectfully submitted,

**MT TOOL AND MANUFACTURING**

Date:  December 9, 2016          By:     s/Charles T. Riggs Jr.
                                         *One of the Attorneys for Defendant*

Charles T. Riggs Jr.
IL Bar No. 6225931
Law Office of Charles T. Riggs Jr.
551 Forest Ave.
River Forest, IL 60305
(708) 828-6130
riggs@riggs.pro

John F. Rollins
IL Bar No. 6227085
Law Office of John F. Rollins
210 N. Ellis Avenue
Wheaton, IL 60187
Phone: 630 649-9688
tlojfr@gmail.com

## CERTIFICATE OF SERVICE

I, Charles T. Riggs Jr., an attorney, hereby certify that on December 9, 2016, I caused the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF electronic filing system, which will send a notice of electronic filing to counsel of record.

s/Charles T. Riggs Jr.

EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LECAT'S VENTRILOSCOPE, | : | CASE NO.: 1:16-cv-05298 |
| | : | |
| Plaintiff, | : | |
| | : | Chief Judge Ruben Castillo |
| -vs- | : | |
| | : | |
| MT TOOL AND MANUFACTURING, | : | Magistrate Judge Jeffrey T. Gilbert |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S INITIAL INFRINGEMENT CONTENTIONS PURSUANT TO LOCAL**
**PATENT RULE 2.2**

Plaintiff Lecat's Ventriloscope, LLC ("Lecat"), in accordance with Local Patent Rule 2.2,

sets forth its Initial Infringement Contentions to Defendant MT Tool and Manufacturing, Inc.

("MT Tool"). Lecat reserves the right to amend its Initial Infringement Contentions in

accordance with applicable rules or orders.

Local Patent Rule 2.2 sets forth:

A party claiming patent infringement must serve on all parties "Initial Infringement
Contentions" containing the following information within fourteen (14) days after the
Initial Disclosure under LPR 2.1:

   (a) identification each claim of each patent in suit that is allegedly infringed by the
   opposing party, including for each claim the applicable statutory subsection of 35
   U.S.C. § 271;

   (b) separately for each asserted claim, identification of each accused apparatus,
   product, device, process, method, act, or other instrumentality ("Accused
   Instrumentality") of the opposing party of which the party claiming infringement
   is aware. Each Accused Instrumentality must be identified by name, if known, or
   by any product, device, or apparatus which, when used, allegedly results in the
   practice of the claimed method or process;

   (c) a chart identifying specifically where each element of each asserted claim is found
   within each Accused Instrumentality, including for each element that such party

contends is governed by 35 U.S.C. § 112(6), a description of the claimed function of that element and the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function;

(d) identification of whether each element of each asserted claim is claimed to be present in the Accused Instrumentality literally or under the doctrine of equivalents. For any claim under the doctrine of equivalents, the Initial Infringement Contentions must include an explanation of each function, way, and result that is equivalent and why any differences are not substantial;

(e) for each claim that is alleged to have been indirectly infringed, an identification of any direct infringement and a description of the acts of the alleged indirect infringer that contribute to or are inducing that direct infringement. If alleged direct infringement is based on joint acts of multiple parties, the role of each such party in the direct infringement must be described;

(f) for any patent that claims priority to an earlier application, the priority date to which each asserted claim allegedly is entitled;

(g) identification of the basis for any allegation of willful infringement; and

(h) if a party claiming patent infringement wishes to preserve the right to rely, for any purpose, on the assertion that its own or its licensee's apparatus, product, device, process, method, act, or other instrumentality practices the claimed invention, the party must identify, separately for each asserted patent, each such apparatus, product, device, process, method, act, or other instrumentality that incorporates or reflects that particular claim, including whether it is marked with the patent number.

**(a)      Identification of each claim of each patent in suit that is allegedly infringed by the opposing party, including for each claim the applicable statutory subsection of 35 U.S.C. § 271**

The following claims of U.S. Patent No. 7,645,141 ("the '141 patent") are infringed by

MT Tool. Through discovery, Lecat may find or otherwise identify other infringed claims or

other infringement bases.

| U.S. Patent No. 7,645,141 | Statutory Subsection of 35 U.S.C. §271 |
|---|---|
| Claim 1 | 35 U.S.C. §271(b) |
| Claim 8 | 35 U.S.C. §271(b) |
| Claim 9 | 35 U.S.C. §271(b) |
| Claim 10 | 35 U.S.C. §271(b) |
| Claim 11 | 35 U.S.C. §271(b) |
| Claim 12 | 35 U.S.C. §271(b) |
| Claim 13 | 35 U.S.C. §271(b) |
| Claim 14 | 35 U.S.C. §271(b) |
| Claim 16 | 35 U.S.C. §271(b) |

**(b)** **Separately for each asserted claim, identification of each accused apparatus, product, device, process, method, act, or other instrumentality ("Accused Instrumentality") of the opposing party of which the party claiming infringement is aware. Each Accused Instrumentality must be identified by name, if known, or by any product, device, or apparatus which, when used, allegedly results in the practice of the claimed method or process**

For all indicated claims above, Lecat asserts that the MT S-Scope ("the S-Scope"), made and sold by MT Tool, infringes the '141 patent when used by end-users in accordance with MT Tool's instructions. Through discovery, Lecat may identify other infringing instrumentalities.

**(c)** **a chart identifying specifically where each element of each asserted claim is found within each Accused Instrumentality, including for each element that such party contends is governed by 35 U.S.C. § 112(6), a description of the claimed function of that element and the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function**

Lecat sets forth the following charts:

| CLAIM 1 ELEMENTS | MT TOOL S-SCOPE |
|---|---|
| An arrangement for auscultation training, comprising: | The MT Tools web page describes MT Tool as "a group of people with backgrounds in medicine, teaching, manufacturing, and engineering, providing teaching tools to enhance the learning experience of medical students through simulation." Under the heading "What It Does," the web page further describes the S-Scope as "Once a student places the stethoscope on the appropriate listening post the instructor / SP activates |

3

| | |
|---|---|
| | the sound file. The student hears the sounds through the stethoscope." MT Tool also published a spec sheet (produced under Bates no. DEF1278) entitled "MT S-Scope Simulation Stethoscope," which states that "The MT S-Scope gives students a more realistic auscultation experience." Accordingly, the S-Scope is an auscultation training device and MT Tools makes, sells and actively promotes to end users an arrangement for auscultation training. |
| a signal generator capable of generating an audio signal representing at least one sound, | The MT Tools web page describes the MT Tool App as follows: "The first generation MT S-Scope App allows users to access proprietary stethoscope sound files for a variety of conditions. Case files are included to provide an enhanced learning experience, with complete sets of sounds for each case. Sound files can also be accessed directly for each condition to aid in the evaluation process. The simple and easy to use app is ideal for OSCE encounters. Standardized patients simply tap the appropriate listening post icon to play the corresponding sound through the student's MT S-Scope." The S-Scope spec sheet states that "MT S-Scope Complete includes iPod preloaded with the basic MT sound library." Accordingly, the S-Scope includes a signal generator capable of generating an audio signal representing at least one sound. |
| the signal generator being controlled by a human operator, | The MT Tools web page describes the MT Tool App as follows: "Standardized patients simply tap the appropriate listening post icon to play the corresponding sound through the student's MT S-Scope." The S-Scope spec sheet states, "Once a student places the stethoscope on the appropriate listening post the instructor / SP activates the sound file." At another demonstration, MT Tool's printed information regarding the |

| | S-Scope stated as follows: "The SP or instructor controls the sounds from physiologically graphic touch screen icons." Accordingly, when used in accordance with the instructions provided by MT Tool, a human operator, the standardized patient or instructor, controls the iPhone or iPod that acts as a signal generator for the S-Scope. |
|---|---|
| wherein the human operator plays one or more appropriate audio files according to a user's placement of a stethoscope headpiece on a patient; | The MT Tools web page describes the MT Tool App as follows: "Standardized patients simply tap the appropriate listening post icon to play the corresponding sound through the student's MT S-Scope." The S-Scope spec sheet states, "Once a student places the stethoscope on the appropriate listening post the instructor / SP activates the sound file." At another demonstration, MT Tool's printed information regarding the S-Scope stated as follows: "Students place the bell where they think appropriate. The SP or instructor controls the sounds from physiologically graphic touch screen icons." Accordingly, the standardized patient or instructor taps the appropriate icon for a sound file that corresponds to a student's placement of the stethoscope headpiece on the standardized patient, and the sound file plays. |
| A transmitter associated with the device for transmitting an audio signal corresponding to the at least one sound; | The MT Tools web page describes the S-Scope as follows: "Once a student places the stethoscope on the appropriate listening post the instructor / SP activates the sound file. The student hears the sounds through the stethoscope. Setup is as simple as pairing the scope with the device that will be used to transmit the sounds. The stethoscope is completely wireless and receives stethoscope sounds from the device at a range of up to 30 feet." The S-Scope Getting Started booklet (produced under Bates nos. DEF10-DEF16) states that the "MT S- |

| | |
|---|---|
| | Scope Stethoscope is already paired by Bluetooth to the iPod Touch" and describes how to Bluetooth-pair the components. Accordingly, the iPhone or iPod device plays the file and transmits, using the Bluetooth transmitter, the audio signal of the file to the stethoscope wirelessly. |
| an auscultation device, comprising a stethoscope, | The MT Tools web page describes the S-Scope as follows: "Once a student places the stethoscope on the appropriate listening post the instructor / SP activates the sound file. The student hears the sounds through the stethoscope." The S-Scope spec sheet is entitled "MT S-Scope Simulation Stethoscope" and states that the "MT S-Scope gives students a more realistic auscultation experience." The S-Scope Getting Started booklet refers to the "MT S-Scope Stethoscope." Accordingly, the S-Scope includes a stethoscope. |
| remote from the transmitter, | The MT Tools web page describes the S-Scope as follows: "Setup is as simple as pairing the scope with the device that will be used to transmit the sounds. The stethoscope is completely wireless and receives stethoscope sounds from the device at a range of up to 30 feet." The S-Scope spec sheet shows the stethoscope remote from the iPod. Accordingly, when used, the iPhone or iPod is remote from the stethoscope. |
| the auscultation device comprising: a receiver adapted to receive the audio signal from the transmitter; | The MT Tools web page describes the S-Scope as follows: "Setup is as simple as pairing the scope with the device that will be used to transmit the sounds. The stethoscope is completely wireless and receives stethoscope sounds from the device at a range of up to 30 feet." The S-Scope Getting Started booklet states that the "MT S-Scope Stethoscope is already paired by Bluetooth to the iPod Touch," describes how to Bluetooth-pair the |

|  | components, and refers to a component on the stethoscope as the "receiver body." Accordingly, the stethoscope includes a Bluetooth receiver that is adapted to receive the audio signal from the iPhone or iPod. |
|---|---|
| and a speaker adapted to audibly communicate the audio signal received by the receiver to the user. | The MT Tools web page describes the S-Scope as follows: "Once a student places the stethoscope on the appropriate listening post the instructor / SP activates the sound file. The student hears the sounds through the stethoscope."  The S-Scope Getting Started booklet discusses turning the volume up or down on the stethoscope, which requires the stethoscope to have a speaker. Accordingly, the S-Scope includes some kind of speaker that audibly communicates the audio signal received by the receiver in the stethoscope to the end user. |

| CLAIM 8 ELEMENTS | MT TOOL S-SCOPE |
|---|---|
| The arrangement of claim 1 | See the above chart for claim 1, incorporated herein. |
| wherein the audio signal is representative of an abnormal human physical condition. | The MT Tool web page includes the following statement: "When it comes to simulation stethoscopes you have choices.  The MT S-Scope and App offer a new option for bringing versatility to the classroom and lab."  The MT Tools web page describes the S-Scope as follows: Scopes come packaged with device and app, including multiple different heart and lung sounds with optional cases.  Instructors are also free to use their own devices and sound files.  The MT Tools web page describes the MT Tool App as follows: "The first generation MT S-Scope App allows users to access proprietary stethoscope sound files for a variety of conditions." The S-Scope spec sheet states, "Easy to use, with a library of |

|  | programmed sounds, including: heart, lung and bowel, both normal and abnormal."  Accordingly, the S-Scope includes audio signals representative of a variety of abnormal human conditions. |
| --- | --- |

| CLAIM 9 ELEMENTS | MT TOOL S-SCOPE |
| --- | --- |
| The arrangement of claim 1 | See the above chart for claim 1, incorporated herein. |
| wherein the audio signal is representative of one of: heart sounds, heart murmurs, vascular sounds, lung sounds, abdominal sounds, or Korotkoff sounds. | The MT Tools web page describes the S-Scope as follows: "Scopes come packaged with device and app, including multiple different heart and lung sounds with optional cases."  The S-Scope spec sheet states, "Easy to use, with a library of programmed sounds, including: heart, lung and bowel, both normal and abnormal." Accordingly, when used by an end user, the audio signal is representative of one of heart sounds, heart murmurs, vascular sounds, lung sounds, abdominal sounds, or Korotkoff sounds. |

| CLAIM 10 ELEMENTS | MT TOOL S-SCOPE |
| --- | --- |
| The arrangement of claim 1 | See the above chart for claim 1, incorporated herein. |
| wherein the transmitter wirelessly transmits the audio signal to the receiver. | The MT Tools web page describes the S-Scope as follows: "Setup is as simple as pairing the scope with the device that will be used to transmit the sounds. The stethoscope is completely wireless and receives stethoscope sounds from the device at a range of up to 30 feet." Accordingly, the S-Scope transmitter wirelessly transmits the audio signal to the receiver in the stethoscope. |

| CLAIM 11 ELEMENTS | MT TOOL S-SCOPE |
|---|---|
| The arrangement of claim 1 | See the above chart for claim 1, incorporated herein. |
| wherein the signal generator comprises at least one device from the following list of devices: a compact disc player, a cassette player, a digital audio player, a personal digital assistant, and a computer. | The S-Scope spec sheet states that "MT S-Scope Complete includes iPod preloaded with the basic MT sound library." The S-Scope Getting Started booklet discloses an iPod digital audio player.  Accordingly, the iPod signal generator comprises at least a digital audio player. |

| CLAIM 12 ELEMENTS | MT TOOL S-SCOPE |
|---|---|
| A method for simulating auditory findings in an auscultation device, comprising: | The MT Tools web page describes MT Tool as "a group of people with backgrounds in medicine, teaching, manufacturing, and engineering, providing teaching tools to enhance the learning experience of medical students through simulation."  Under the heading "What It Does," the web page further describes the S-Scope as "Once a student places the stethoscope on the appropriate listening post the instructor / SP activates the sound file. The student hears the sounds through the stethoscope."  The S-Scope spec sheet states that "The MT S-Scope gives students a more realistic auscultation experience." Accordingly, the S-Scope is an auscultation training device and MT Tools makes, sells and actively promotes a method for simulating auditory findings in an auscultation device. |
| an operator observing the placement of an auscultation device by a user relative to a patient; | The MT Tools web page describes the MT Tool App as follows: "Standardized patients simply tap the appropriate listening post icon to play the corresponding sound through the student's MT S-Scope."  The S-Scope spec sheet states, "Once a student places the stethoscope on the appropriate listening post the instructor / SP activates the sound |

| | |
|---|---|
| | file." At another demonstration, MT Tool's printed information regarding the S-Scope stated as follows: "Students place the bell where they think appropriate. The SP or instructor controls the sounds from physiologically graphic touch screen icons." Accordingly, the standardized patient or instructor, either of which may be the operator-observer, taps the appropriate icon for a sound file that corresponds to the placement of the stethoscope headpiece on the standardized patient by the student. |
| the operator selecting an auscultation sound appropriate to the position of the auscultation device relative to the patient; | The MT Tools web page describes the MT Tool App as follows: "Standardized patients simply tap the appropriate listening post icon to play the corresponding sound through the student's MT S-Scope." The S-Scope spec sheet states, "Once a student places the stethoscope on the appropriate listening post the instructor / SP activates the sound file." At another demonstration, MT Tool's printed information regarding the S-Scope stated as follows: "Students place the bell where they think appropriate. The SP or instructor controls the sounds from physiologically graphic touch screen icons." Accordingly, the standardized patient or instructor, either of which may be the operator-observer, taps the appropriate icon for a sound file that corresponds to the placement of the stethoscope headpiece on the standardized patient by the student. |
| transmitting an audio signal corresponding to the selected auscultation sound from a location remote to the auscultation device; | The MT Tools web page describes the S-Scope as follows: "Setup is as simple as pairing the scope with the device that will be used to transmit the sounds. The stethoscope is completely wireless and receives stethoscope sounds from the device at a range of up to 30 feet." The S-Scope Getting Started booklet states that the "MT S-Scope Stethoscope is already |

| | |
|---|---|
| | paired by Bluetooth to the iPod Touch" and describes how to Bluetooth-pair the components. The S-Scope spec sheet is entitled "MT S-Scope Simulation Stethoscope," and states that the "MT S-Scope gives students a more realistic auscultation experience." Accordingly, when used, an iPhone or iPod operating the MT Tools App transmits, using Bluetooth, the selected audio signal corresponding to the selected auscultation sound to the remote stethoscope. The stethoscope is an auscultation device. |
| receiving the audio signal on the auscultation device; | The MT Tools web page describes the S-Scope as follows: "Setup is as simple as pairing the scope with the device that will be used to transmit the sounds. The stethoscope is completely wireless and receives stethoscope sounds from the device at a range of up to 30 feet." The S-Scope Getting Started booklet states that the "MT S-Scope Stethoscope is already paired by Bluetooth to the iPod Touch," describes how to Bluetooth-pair the components, and refers to a component on the stethoscope as the "receiver body." Accordingly, when used, the stethoscope, which is an auscultation device, receives the audio signal from a remote iPhone or iPod operating the MT Tools App. |
| communicating at least one sound represented by the audio signal to the user of the auscultation device. | The MT Tools web page describes the S-Scope as follows: "Once a student places the stethoscope on the appropriate listening post the instructor / SP activates the sound file. The student hears the sounds through the stethoscope." Accordingly, when used, the S-Scope communicates at least one sound represented by the audio signal to the user of the auscultation device. |

| CLAIM 13 ELEMENTS | MT TOOL S-SCOPE |
|---|---|
| The method of claim 12 | See the above chart for claim 12, incorporated herein. |
| wherein the auscultation device is a stethoscope. | The MT Tools web page describes the S-Scope as follows: "Once a student places the stethoscope on the appropriate listening post the instructor / SP activates the sound file. The student hears the sounds through the stethoscope." The S-Scope spec sheet is entitled "MT S-Scope Simulation Stethoscope" and states that the "MT S-Scope gives students a more realistic auscultation experience." The S-Scope Getting Started booklet refers to the "MT S-Scope Stethoscope." Accordingly, the S-Scope's auscultation device is a stethoscope. |

| CLAIM 14 ELEMENTS | MT TOOL S-SCOPE |
|---|---|
| The method of claim 12 | See the above chart for claim 12, incorporated herein. |
| wherein audio signal is representative of an abnormal human physical condition. | The MT Tool web page includes the following statement: "When it comes to simulation stethoscopes you have choices. The MT S-Scope and App offer a new option for bringing versatility to the classroom and lab." The MT Tools web page describes the S-Scope as follows: Scopes come packaged with device and app, including multiple different heart and lung sounds with optional cases. Instructors are also free to use their own devices and sound files. The MT Tools web page describes the MT Tool App as follows: "The first generation MT S-Scope App allows users to access proprietary stethoscope sound files for a variety of conditions." The S-Scope spec sheet states, "Easy to use, with a library of programmed sounds, including: heart, lung and bowel, both normal and abnormal." Accordingly, the S-Scope |

12

|  | includes audio signals representative of a variety of abnormal human conditions. |
|---|---|

| CLAIM 16 ELEMENTS | MT TOOL S-SCOPE |
|---|---|
| The method of claim 12 | See the above chart for claim 12, incorporated herein. |
| wherein the step of communicating the at least one sound represented by the audio signal to a user of the auscultation device comprising playing the sound with a speaker. | The MT Tools web page describes the S-Scope as follows: "Once a student places the stethoscope on the appropriate listening post the instructor / SP activates the sound file. The student hears the sounds through the stethoscope." The S-Scope Getting Started booklet discusses turning the volume up or down on the stethoscope, which requires the stethoscope to have a speaker. Accordingly, the S-Scope includes some kind of speaker that plays the at least one sound represented by the audio signal received by the receiver in the stethoscope to the user of the stethoscope. |

**(d)** **Identification of whether each element of each asserted claim is claimed to be present in the Accused Instrumentality literally or under the doctrine of equivalents. For any claim under the doctrine of equivalents, the Initial Infringement Contentions must include an explanation of each function, way, and result that is equivalent and why any differences are not substantial**

Lecat asserts that every element in each of the asserted claims is literally present in the

Accused Instrumentality. Through discovery, Lecat may identify other bases for infringement.

**(e)** **For each claim that is alleged to have been indirectly infringed, an identification of any direct infringement and a description of the acts of the alleged indirect infringer that contribute to or are inducing that direct infringement. If alleged direct infringement is based on joint acts of multiple parties, the role of each such party in the direct infringement must be described**

Lecat asserts that MT Tool indirectly infringes all asserted claims of the '141 patent.

13

Particularly, Lecat asserts that the S-Scope meets every physical claim limitation in the asserted claims of the '141 patent, as outlined in the above claim charts. In addition, Lecat asserts that the method steps found within the independent claims, specifically claims 1 and 12, of the '141 patent are directly infringed by users of the S-Scope when the S-Scope is used according to the instructions provided by MT Tool.

      i.      <u>MT Tool Teaches its Users to Use the Patented Method of the '141 Patent</u>

MT Tool instructs that the S-Scope, when paired with the MT Tool App, functions to receive and play sound files that correspond to a user's placement of the stethoscope head on the appropriate listening post of a patient. An observer triggers the playing of the selected sound file once the placement of the stethoscope head is determined. Specifically, the MT Tool website teaches that: "Once a student places the stethoscope on the appropriate listening post the instructor / SP activates the sound file. The student hears the sounds through the stethoscope. Setup is as simple as pairing the scope with the device that will be used to transmit the sounds. The stethoscope is completely wireless and receives stethoscope sounds from the device at a range of up to 30 feet. Scopes come packaged with device and app, including multiple different heart and lung sounds with optional cases." At another demonstration, MT Tool's printed information regarding the S-Scope stated as follows: "Students place the bell where they think appropriate. The SP or instructor controls the sounds from physiologically graphic touch screen icons." As taught by MT Tool, the user (student) places the stethoscope on a patient (listening post) and an observer (either an instructor or the standardized patient) then triggers the playback of the appropriate sound file using the MT Tool App, which is remote from the receiver.

      ii.     <u>Roles of the Parties</u>

For all asserted claims, the end users of the MT S-Scope directly infringe the claims of

the '141 patent when they use the S-Scope according to the instructions provided by MT Tool.

Discovery is necessary to ascertain the full scope of direct infringement by MT Tool's customers

and S-Scope end users. Lecat has reason to believe, and has a reasonable expectation that

discovery will further reveal, that MT Tool itself may have made demonstrative and/or

instructional use of the S-Scope that likewise directly infringes the claims of the '141 patent. MT

Tool induces this direct infringement by making, offering for sale, and selling the S-Scope and

by instructing its customers, including purchasers and users of the S-Scope, to use the S-Scope

according to its instructions, which results in the direct infringement.

**(f)** **For any patent that claims priority to an earlier application, the priority date to which each asserted claim allegedly is entitled**

For each asserted claim of the '141 patent, the priority date is:

| U.S. Patent No. 7,645,141 | Priority Date |
|---|---|
| Claim 1 | September 19, 2005 |
| Claim 8 | September 19, 2005 |
| Claim 9 | September 19, 2005 |
| Claim 10 | September 19, 2005 |
| Claim 11 | September 19, 2005 |
| Claim 12 | September 19, 2005 |
| Claim 13 | September 19, 2005 |
| Claim 14 | September 19, 2005 |
| Claim 16 | September 19, 2005 |

**(g)** **Identification of the basis for any allegation of willful infringement**

Ms. Peg Lechner, who is associated with MT Tool, requested and received from Lecat a

price quote for the Ventriloscope (a device sold by Lecat that falls within the scope of the '141

patent when used as instructed and that is marked with the patent number – see (h) below) in

2010. Ms. Lechner also attended in 2011 a presentation where Lecat demonstrated the

Ventriloscope.

Dr. Paul Lecat attended a presentation at the 2014 ASPE Conference where Mr. Tom Lechner of MT Tool demonstrated the S-Scope (the Accused Instrumentality). Mr. Lechner told Dr. Lecat that he began working on the S-Scope four years earlier – corresponding to when Ms. Lechner requested information on the Ventriloscope from Lecat. Mr. Lechner told Dr. Lecat that he was aware of the patented Ventriloscope.

Counsel for Lecat sent a cease-and-desist letter to MT Tool on January 12, 2015. *See* Ex. C. to Compl. Dr. Lecat also hand-delivered a copy of this letter to Mr. Lechner at the 2011 IMSH Conference and again told Mr. Lechner that use of the S-Scope infringed the '141 Patent.

Despite MT Tool's knowledge of the '141 patent and the infringement thereof, MT Tool continued to make, use, offer for sale, and sell the S-Scope to its customers, and continued to instruct those customers to use the S-Scope in an infringing manner. Lecat believes that discovery will confirm that MT Tool subjectively knew or should have known that it was infringing the '141 patent.

**(h)      If a party claiming patent infringement wishes to preserve the right to rely, for any purpose, on the assertion that its own or its licensee's apparatus, product, device, process, method, act, or other instrumentality practices the claimed invention, the party must identify, separately for each asserted patent, each such apparatus, product, device, process, method, act, or other instrumentality that incorporates or reflects that particular claim, including whether it is marked with the patent number**

Lecat manufactures and sells the following products, the instructed uses of which are covered by the claims of the '141 patent:

| Product | Claims | Marked |
|---|---|---|
| Lecat Ventriloscope | 1, 5, 6, and 8-16 | Yes |
| Lecat Ventrilophone | 1, 5, 8-14, and 16 | |
| Master Clinician Stethoscope | 1, 5, 8-14, and 16 | |

**CONCLUSION**

Plaintiff Lecat's Ventriloscope, LLC expressly reserves the right to amend or otherwise supplement these Initial Infringement Contentions based on information revealed during discovery.

Dated:  November 30, 2016        ___/s/ Andrew S. Curfman_____
                                       Andrew S. Curfman (OH 0090997)
                                       Roger D. Emerson (OH 0037731)
                                       Sergey Vernyuk (OH 0089101)
                                       EMERSON THOMSON BENNET, LLC
                                       1914 Akron-Peninsula Road
                                       Akron, OH 44313
                                       330-434-9999

                                       Ronald B. Kowalczyk, Esq.
                                       KOWALCZYK LAW OFFICES
                                       100 Illinois Street, Suite 200
                                       Saint Charles, IL 60174
                                       Office: 630.665.2224
                                       Mobile: 630.660.1260

                                       *Attorneys for Plaintiff Lecat's Ventriloscope, LLC.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Initial Infringement Contentions is being

served by e-mail on the following date to:

Charles T. Riggs Jr.
riggs@riggs.pro
**LAW OFFICE OF CHARLES T. RIGGS JR**.

John F. Rollins
tlojfr@gmail.com
**LAW OFFICE OF JOHN F. ROLLINS**


Date: November 30, 2016              /s/ Andrew S. Curfman
                                                Andrew S. Curfman (OH 0090997)
                                                asc@etblaw.com
                                                **EMERSON THOMSON BENNETT, LLC**
                                                1914 Akron-Peninsula Road
                                                Akron, OH 44313
                                                Phone: 330-434-9999
                                                Fax: 330-434-8888

# EXHIBIT B

Fatigue Fracture Technology LLC

Plaintiff,

v.

Case No.: 1:15–cv–05667
Honorable John Robert Blakey

Navistar, Inc.

Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, October 17, 2016:

MINUTE entry before the Honorable John Robert Blakey: Defendant has moved to strike certain portions of Plaintiff's initial infringement contentions –– namely, the contention relating to infringement under the doctrine of equivalents and the contention relating to indirect infringement. The motion is granted. Local Patent Rule 2.2(d) requires that for "any claim under the doctrine of equivalents, the Initial Infringement Contentions must include an explanation of each function, way, and result that is equivalent and why any differences are not substantial." FFT's initial infringement contention on literal infringement and infringement under the doctrine of equivalents provides as follows: "FFT presently contends that the Navistar Accused Instrumentalities literally infringe the asserted claim of the '361 Patent. Nevertheless, with respect to any claim element or limitation that may be found not to be literally embodied in the Accused instrumentalities, FFT contends in the alternative that the Accused Instrumentalities embody such claim elements or limitations under the doctrine of equivalents and that any claim element of limitation not found to be literally met is equivalently met because any difference between the claim element or limitation and the Accused Instrumentalities is not a substantial difference. Accordingly, FFT contends that any asserted claim not found to be embodied literally is nevertheless embodied by the Accused Instrumentalities under the doctrine of equivalents." [61–1], p. 4. FFT's contention provides no explanation as to why this is so; nor does it explain why any differences in the accused products are not substantial. As a result, it is insufficient under LPR 2.2(d). Turning to the indirect infringement contention, LPR 2.2(e) requires FFT to provide, "for each claim that is alleged to have been indirectly infringed, an identification of any direct infringement and a description of the acts of the alleged indirect infringer that contribute to or are inducing that direct infringement." FFT's contention on direct and indirect infringement provides as follows: "For the reasons explained with respect to the accused part that is the subject of the ESI Report, FFT presently contends that Navistar sourced parts from at least [REDACTED] in a way that induced infringement of the '361 Patent." [61–1], p. 4. The attached report does not mention anyone other than Navistar and does not describe any acts by Navistar. Although the contention itself references "sourcing," FFT has not described the "way" in which Navistar induced infringement. For these reasons, FFT's contentions are insufficient in their current form. FFT is given 21 days from the date of this Order to amend its infringement contentions to include additional information consistent with the

requirements of LPR 2.2. The status hearing previously set for 10/20/16 is stricken and reset to 11/17/16 at 9:45 a.m. in Courtroom 1725. Mailed notice(gel, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.