# EXHIBIT B

*Lecat's Ventriloscope v. MT Tool and Manufacturing.,* No. 1:16-cv-05298

**Stipulations and Statement of Uncontested Facts**

Some of the proposed stipulations concern information that is designated for protection under the Court's protective order.

1. Plaintiff Lecat's Ventriloscope, LLC is an Ohio limited liability company with its principal place of business at 164 West Ave., #132, Tallmadge, OH 44278.

2. Dr. Paul Lecat is Plaintiff's vice president.

3. Defendant MT Tool and Manufacturing, Inc. d/b/a MT Tool is an Illinois corporation with its principal place of business at 1118 Lunt Ave., Suite E, Schaumburg, IL 60193.

4. Mr. Thomas Lechner is Defendant's president.

5. Ms. Margaret "Peg" Lechner is Defendant's secretary.

6. There are no questions of: propriety of parties; correctness of identity of legal entities; necessity for appointment of guardian, administrator, executor, or other fiduciary, and validity of appointment if already made; correctness of designation of party as partnership, corporation, or individual d/b/a trade name.

7. There are no questions of misjoinder or nonjoinder of parties.

8. The U.S. Patent and Trademark Office issued U.S. Patent No. 7,645,141 (the "'141 Patent"), entitled Arrangement for Auscultation Training, to Paul Lecat on January 12, 2010.

9. Plaintiff owns the '141 Patent by valid assignment from Dr. Paul Lecat.

10. Dr. Lecat applied for the '141 Patent by filing application no. 11/523,224 on September 19, 2006, with the U.S. Patent and Trademark Office.

1

11. Dr. Lecat filed provisional application no. 60/718,368 on September 19, 2005.

12. The '141 Patent is entitled to the benefit of provisional application no. 60/718,368.

13. Dr. Lecat conceived of and reduced to practice the invention disclosed in the '141 Patent.

14. Dr. Lecat in 2005 reduced to practice the invention disclosed in the '141 Patent.

15. During prosecution of the '141 Patent, the U.S. Patent and Trademark Office Examiner considered, the documents listed in the "References Cited" section on the cover page of the '141 Patent, namely:

    a.  U.S. Patent Nos. 3,947,974 (Gordon); 4,770,189 (Shyu); 6,220,866 (Amend); 6,503,087 (Eggert); 6,527,559 (Yoshii); 7,115,102 (Abbruscato); 7,209,796 (McKinney);

    b.  U.S. Patent Application Publication Nos. 2004/0076303 (Vyshedsky); 2004/0157612 (Kim); 2005/0048455 (Hayamizu); 2005/0131307 (Ruiter); 2005/0148283 (Schwalm);

    c.  Japanese Patent Application Publication Nos. 09-146452 (Noryoku Kaihatsu Kogaku Center); 2005-077521 (Gifu University); 2005-227534 (Gifu University);

    d.  World Intellectual Property Organization International Publication No. WO2006/047400 (McKenzie);

    e.  "Technology To Inspire: Technology Archive Electronic Stethoscope," Project Centre report (July 7, 2003).

16. Of these documents listed in the "References Cited" section on the cover page of the '141 Patent, Dr. Lecat submitted all of them to the U.S. Patent and Trademark Office, except for U.S. Patent Nos. 3,947,974 (Gordon); 6,503,087 (Eggert); 6,527,559 (Yoshii), which the patent examiner found in his own search.

2

17. The '141 Patent is currently in force, with all outstanding maintenance fees paid.

18. Plaintiff sold and sells several auscultation training products, namely the Ventriloscope, Ventriloscope Live, Ventrilophone, and Master Clinician Stethoscope.

19. In 2011, at the Annual Association of Standardized Patient Educators (ASPE) Conference, Ms. Lechner attended a dinner where Plaintiff discussed its Ventriloscope.

20. Defendant makes and sells the MT S-Scope ("S-Scope").

21. Defendant owns website www.mttool.com.

22. Defendant has control over the website content of www.mttool.com.

23. Defendant's first sale of the S-Scope occurred on January 20, 2012.

24. (CONFIDENTIAL) Defendant has sold RE S-Scopes from REDACTED to REDACTED.

25. The S-Scope is designed for auscultation training, learning, and simulation.

26. The basic components of the S-Scope are (a) an iPod and (b) a simulation stethoscope.

27. The S-Scope iPod is preloaded with recorded body sounds.

28. Playing the recorded body sounds on the S-Scope iPod requires an operator to trigger them.

29. The iPod of the S-Scope includes a signal generator capable of generating an audio signal representing at least one recorded sound.

30. The iPod of the S-Scope includes a signal generator that requires human-operator control.

31. Defendant's website and flyer included statements that once a student places the stethoscope on the appropriate listening post the instructor/SP activates the sound file and the student hears the sounds through the stethoscope.

3

32. The iPod of the S-Scope includes a transmitter associated with the signal generator for transmitting an audio signal corresponding to at least one recorded sound.

33. The S-Scope iPod includes a Bluetooth transmitter for transmitting an audio signal corresponding to at least one recorded sound from the iPod audio circuitry.

34. The S-Scope simulation stethoscope includes a nonfunctioning headpiece, a control box, tubing connecting the headpiece to a control box, two earpieces, and tubing connecting the control box to the earpieces.

35. The S-Scope simulation stethoscope is remote from the iPod.

36. The S-Scope simulation stethoscope includes a receiver adapted to receive the audio signal from the transmitter.

37. The S-Scope simulation stethoscope includes a Bluetooth receiver that pairs with the S-Scope iPod for wireless transmission of recorded sounds from the iPod to the simulation stethoscope.

38. The S-Scope simulation stethoscope includes a speaker for playing the received recorded sounds.

39. The recorded body sounds preloaded on the S-Scope iPod include sounds representative of an abnormal human physical condition.

40. The recorded body sounds preloaded on the S-Scope iPod include sounds for pneumonia, COPD, and Asthma.

41. The recorded body sounds preloaded on the S-Scope iPod include heart, lung, and bowel sounds.

42. The S-Scope iPod is a digital audio player.

43. The S-Scope iPod is a personal digital assistant.

4

44. The S-Scope can be used in a method where an operator observes the placement of the simulation stethoscope by a user relative to a patient and selects a recorded auscultation sound appropriate to the position of the simulated stethoscope relative to the patient, where an audio signal corresponding to the selected recorded auscultation sound is transmitted from a location remote to the simulation stethoscope and received by the simulation stethoscope, and where at least one recorded sound represented by the audio signal is communicated to the user of the simulation stethoscope.

45. When Dr. Lecat and Mr. Lechner spoke at the 2014 ASPE Conference, Dr. Lecat told Mr. Lechner that the S-Scope was infringing Plaintiff's patent.

46. On January 12, 2015, Plaintiff sent and hand-delivered to Defendant a letter (from Plaintiff's attorney) that (a) informed Defendant of the '141 Patent, (b) stated Plaintiff's belief that Defendant infringed that patent through the S-Scope, and (c) asked Defendant to stop making and marketing the S-Scope.

47. In response to Plaintiff's January 2015 letter, Defendant's attorney sent a letter to Plaintiff on February 24, 2015, stating, in part, Defendant's belief that (a) the '141 Patent claims require a functioning auscultation device, (b) Defendant's S-Scope is not a functioning auscultation device, and (c) the S-Scope therefore does not infringe the '141 Patent.

48. Defendant did not stop selling the S-Scope since receipt of the February 17, 2015 noninfringement opinion.

49. (CONFIDENTIAL) Defendant sold REDACT S-Scopes from the time of its counsel's February 17, 2015 noninfringement opinion to the filing of this suit in May 2016.

50. (CONFIDENTIAL) Since Plaintiff filed this suit in May 2016, Defendant has sold RE S-Scopes through June 2018.

51. Defendant was aware of the existence of the '141 Patent since at least June 2014.

52. The '141 patent discloses an arrangement and method for auscultation training including a transmitter associated with an audio device for transmitting an audio signal to an auscultation device.

53. In the '141 patent, the auscultation device may include a receiver for receiving the audio signal from the transmitter and a speaker for relaying the sound to the end user.

54. In the '141 patent, the arrangement may allow for the broadcast of simulated medical sounds to a generally, normal appearing auscultation device for the purposes of teaching or testing using simulated patient scenarios, while allowing for normal person-to-person interaction between the simulated patient and physician.

55. Auscultation is the act of listening to sounds within the body as a method of diagnosis.

56. A stethoscope is an example of an auscultation device that is used in the medical field to listen to internal sounds in the human body, such as for example heart sounds, breathing (breath sounds), intestinal noises, and blood flow in arteries and veins.

57. Acoustic stethoscopes operate on the transmission of sound from a head piece, via air-filled hollow tubes, to the listener's ears.

58. The head piece of a stethoscope may include a diaphragm that can be placed against a human body for sensing sound.

59. If a stethoscope includes a diaphragm, body sounds vibrate the diaphragm creating acoustic pressure waves that travel up the tubing to the listener's ears.

6

60. The invention of the '141 patent relates to an arrangement that provides for the transmission of audio signals to an auscultation device for medical simulation.

61. In accordance with another embodiment of the '141 patent, a method for transmitting auditory findings to a modified auscultation device is provided.

62. In the '141 patent, the method may include wirelessly transmitting an audio signal from a remote location to the modified auscultation device, receiving the signal on the auscultation device, and relaying the sound represented in the audio signal to the end user through the auscultation device.

63. In one embodiment of the '141 patent, the transmitter sends a wireless signal to the auscultation device.

64. In another embodiment of the '141 patent, the auscultation device is a stethoscope modified to include a receiver and speaker.

65. All of the exemplary arrangements of the '141 patent, though referred to as for auscultation training, may be used outside of the medical profession for training in the diagnosis of problems with equipment or engines or anything that may be diagnosed by detecting and identifying a characteristic sound generated from the thing.

66. In the '141 patent, the device used to detect the sound on the person or thing being diagnosed need not necessarily be a stethoscope, but can be any suitable auscultation device or sound detecting device.

67. In the embodiment shown in Figure 1 of the '141 patent, the receiver 20 and output device 22 may be attached to or integrated in an auscultation device 24, such as for example, a stethoscope.

68. In the '141 patent, the embodiment of FIG. 2 also includes an auscultation device 40 realized as a stethoscope and a FM radio receiver 42 and a speaker 44 (see FIG. 3) mounted in the stethoscope 40.

69. In the embodiment shown in Figure 2 of the '141 patent, the stethoscope 40 is illustrated as an acoustic stethoscope but may be any suitable stethoscope, including an electronic stethoscope.

70. In the embodiment shown in Figure 2 of the '141 patent, the stethoscope 40 includes a head piece 48, which may be a head piece assembly 48, an ear piece assembly 50, which may include at least one ear piece, e.g., a pair of ear pieces 52, 54, and tubing 56, which may be a tubing assembly 56, having a generally hollow interior.

71. In the embodiment shown in Figure 2 of the '141 patent, the tubing assembly 56 connects the ear piece assembly 50 to the head piece assembly 48.

72. In the embodiment shown in Figure 2 of the '141 patent, the head piece assembly 48 may include a diaphragm 58 and a body portion 60.

73. In the embodiment shown in Figure 3 of the '141 patent, the body portion 60 includes a sound passageway 62 in communication with the hollow interior of the tubing assembly 56.

74. In the embodiment shown in Figure 3 of the '141 patent, the diaphragm 58 mounts to the body portion 60 adjacent but spaced apart from the opening 64 for the sound passageway 62.

75. In the embodiment shown in Figure 3 of the '141 patent, the speaker 44 may mount in the space between the diaphragm 58 and the body portion 60, proximate the opening 64, such

that speaker 44 is concealed within the head piece assembly 48 while readily communicating sound to the passageway 62.

76. In the manner illustrated and described with respect to the embodiment shown in Figure 3 of the '141 patent, the sound generated by the speaker 44 travels through the stethoscope 40 in the same manner as sound generated by the diaphragm 58 would, thus providing a realistic simulation of an auscultatory finding.

77. In the embodiment shown in Figure 3 of the '141 patent, the receiver 42, speaker 44, and power source may all be concealed within the head piece assembly 48 of the stethoscope 40.

78. As described in the '141 patent, when the user places the headpiece assembly 48 of the stethoscope 40 in the proper location on the patient, an operator of the audio device 32 may play the appropriate audio file.

79. As construed by the Court, an "auscultation device" is a device that has structure which allows a user to perform the act of listening to sounds arising within a human body or a thing (such as equipment or engines) as a method of diagnosis.

80. The '141 patent discloses two examples of "auscultation devices," namely "acoustic stethoscope" and "electronic stethoscope".

81. The provisional application of the '141 patent states that the stethoscope disclosed therein is "modified by placing a small earphone speaker under the diaphragm and running the wire through the tubing to a small FM radio receiver attached below the spring of the stethoscope."

82. The provisional application of the '141 patent states that the "transmitted sound blocks out other normally heard sounds from the patient".

9

83. In an Office Action dated February 5, 2009, the USPTO initially rejected the original claims of the '141 Patent application, some of them as anticipated by in view of U.S. Patent No. 6,220,866 issued to Amend et al. ("Amend"), alone or as obvious in combination with other prior art.

84. The nonprovisional application for the '141 patent included an independent claim 12 directed to a "training stethoscope."

85. In the February 2009 Office Action in the nonprovisional application for the '141 patent, the Examiner rejected original claim 12 and all its dependent claims on the basis of prior art.

86. In its responsive amendment to the February 2009 Office Action in the nonprovisional application for the '141 patent, the applicant canceled original claim 12 and all its dependent claims without explanation.

87. Plaintiff amended original claim 1 and original claim 17 in the nonprovisional application for the '141 patent to overcome the Examiner's rejection, adding certain limitations.

88. Amend et al., U.S. Pat. No. 6,220,866, discloses placing a speaker 214 adjacent to an ear piece of a stethoscope (see Figure 5).

89. In one embodiment of the '141 patent, the position of the speaker in the headpiece of the stethoscope allows the device to function as both a standard stethoscope and as a training device.

90. In one embodiment of the '141 patent, a speaker may be mounted in the headpiece of the stethoscope to provide a realistic simulation of an auscultatory finding.

91. In the embodiment of Figure 3 of the '141 patent, whether the user is using the auscultation device as either a standard stethoscope or as a training device, the sound originates in the headpiece of the stethoscope via either the diaphragm or the speaker.

92. The headpiece/bell of the MT S-Scope is a mere prop. The recorded sound on the MT S-Scope does not travel from the headpiece/bell to the ear pieces; instead it travels from the control box to the ear pieces.

93. The MT S-Scope only functions as a simulation device, not as a standard stethoscope, and is limited to reproducing prerecorded sound files.

94. The MT S-Scope does not have a diaphragm.

95. The MT S-Scope cannot perform actual stethoscope functions and acquire sound other than that produced by the receiver.

96. MT Tool received advice of counsel in the form of a non-infringement opinion informing MT Tool of counsel's opinion that it does not infringe the '141 patent.

97. Dr. Lecat and/or his attorneys knew of the Nasco Life/form Auscultation Trainer and SmartScope LF01142U and/or documents identifying this product during the pendency of the non-provisional application for the '141 patent.

98. Dr. Lecat and/or his attorneys knew of the Nasco Life/form Auscultation Trainer and SmartScope LF01144U and/or documents identifying this product during the pendency of the non-provisional application for the '141 patent.

99. Dr. Lecat and/or his attorneys knew of the February 5, 2008 printout of webpages showing Nasco Life/form products (Document LV07008807-LV07008813) during the pendency of the non-provisional application for the '141 patent.

11

100.    The University of Miami's Harvey the Cardiopulmonary Patient Simulator is

prior art to the '141 patent.

101.    Dr. Lecat knew of the University of Miami's Harvey the Cardiopulmonary Patient

Simulator during the pendency of the non-provisional application for the '141 patent.

102.    Dr. Lecat called Nasco to discuss Nasco products during the pendency of the non-

provisional application for the '141 patent, and subsequently discussed this call with his

attorneys.